Can the attorneys on Gibson please approach and identify yourselves for the record. For the people of Michael J. O'Rourke, O-R-U-R-K-E, Special Prosecutor. Good morning. Good morning, Your Honor. Joel Brodsky, B-R-O-D-S-K-Y, on behalf of James Gibson. Ramon Moore, on behalf of the appellant, James Gibson. Good morning. All righty, so we normally allow 15 minutes for each side. Is everybody arguing? Who's arguing? I am, and if I need help, let's step right in. Go ahead. Your Honor, we would like to reserve, if we could, at least 15 minutes for primary argument, and then Mr. Brodsky will now argue for 10 minutes for rebuttal. We usually don't do that long, Mr. Brodsky, but why don't we see how it goes, okay? All right. Mr. Moore, do you want to proceed? May it please the Court, Counsel. Again, my name is Ramon Moore, and myself, along with Joel Brodsky, represent the appellant, James Gibson, in this matter. And this matter is important, Your Honors, because James Gibson was afforded a judiciary hearing pursuant to the Torture and Inquiry Relief Commission. And at that hearing, he presented ample evidence to establish that he was, in fact, tortured into giving a confession by the subordinates of John Virge during his interrogation. At that hearing, there were several errors that occurred by the trial court. And in our brief, we list at least 10 issues. Today, I'd like to focus on three issues. However, I am prepared to answer any questions of yours on the remaining issues. The first issue, Your Honor, is that the court dared and failed to shift the burden of proof to the State. In this case, according to People v. World, it appears that the burden of proof is that the appellant, James Gibson, would have to prove beyond a preponderance of the evidence that he, in fact, was tortured into giving a confession during his interrogation. And then once establishing that burden, the burden would then shift to the State, who, in turn, would be held to a higher standard and would have to prove or rebut that by clear and convincing evidence. In this case, that burden shifting never occurred. The State, I'm sorry, Mr. Gibson presented ample evidence. Some of the evidence that he presented to the trial court was, first, the photos taken of him, of his injuries at bond court, which were contemporaneous to the allegation of torture. He testified that at bond court, he approached the bench, and it was made aware to the judge that he was beaten by the police, and it was ordered that the public defender take photos of those injuries. Those photos showed injuries to his chest and other areas of his upper torso. Also, what was presented to the trial court to establish that Mr. Gibson was, in fact, tortured was the medical records from CERMEC. From branch 66 bond court, Mr. Gibson was transferred to CERMEC, and at CERMEC, he complained, again, of being tortured by the police. He was examined at least on two different occasions, and at least one of the medical staff, at least one of them determined and memorialized that they did, in fact, observe the bruises and injuries as well. Also, Mr. Gibson presented the immediate outcry to his family. According to his testimony, once released from custody, he returned home to where his family was waiting for him, and his family members, Lorraine Brown and his niece, Samara, they testified that they observed Mr. Gibson upon being released, and they observed him to be disheveled, and they observed his injuries. Upon Lorraine Brown's insistence, OPS was called, and Mr. Gibson eventually complained to the OPS investigator that he had been abused, and this is all contemporaneous during the time period that he was abused by the Iraq police. Also, what was presented to the court was Dr. Kaufman's expert opinion. Dr. Kaufman had the chance to review the medical records and the photos, and he opined, based on a reasonable degree of medical certainty, that, in fact, those injuries that were exhibited through the report and the photos were, in fact, consistent with Gibson's claim of torture. And one of the more important pieces of evidence that was presented to the court at the hearing was Mr. Gibson's co-defendant's testimony. Eric Johnson testified that he was arrested along with Mr. Gibson, and he, too, was subject to the same abuse that Mr. Gibson claimed by the same detectives during the same time period and at the same location. And what's important in regards to his testimony is that, in fact, his testimony was given such credence or validity that he was, in fact, granted a new trial and eventually was agreed to plead guilty without admitting guilt. In Alfred. In Alfred, please. And was actually released immediately. Did the state ever acknowledge that Johnson was beaten in custody? No, there was no actual, not verbally or outright, but I believe through their actions. I understand. But they never said that, right? Sure. That's probably one of the reasons for an Alfred plea. Correct. And, in fact, he'd been granted a new trial at that point? Yes. Or he'd been granted a hearing at the post-conviction level? Post-conviction. And I believe the state agreed to a new trial where they were able to enter the plea. And then they entered the Alfred plea. Correct. And my argument is that those actions, obviously, tend to show that his claims were valid. Also, Your Honor, was presented, so all of this evidence was presented at the trial to show overwhelmingly that, in fact, Mr. Gibson had substantiated a claim of torture beyond hundreds of evidence. And at that point, the burden should have shifted to the state to rebut those emphases by clear and convincing evidence. The state, by the judge's ruling, the state never had to meet his burden in this case. By the court's ruling, it appears that the burden never shifted and the state did not have to. . . Did the state present any rebuttal evidence whatsoever? Your Honor, the state did present some evidence. They presented the testimony of several officers. Detectives were called. Detective Cesar testified that when he testified, his testimony amounted to, really, it's not corroborative at all. He testified that he. . . The police officers that took the victim in? Yes, those officers were. . . How should the court handle that? Enjoy your answer, Judge. Those officers, Detective Palladino and Sergeant Byrne, were given the opportunity to rebut these horrible claims. And instead of rebutting, what they did was, took the Fifth Amendment and decided not to add anything to this, not to shed any light, not to rebut this. Didn't Judge Walsh say, though, that the other detectives provided enough information that she could make an assessment without their testimony? Is it your position today, Mr. Moore, that the mere fact that they've asserted the Fifth Amendment right, that in and of itself is enough to make a torture finding? No, Your Honor. Actually. . . But with the photographs and the testimony that the defense presented. . . But you're saying that the state, as soon as they assert the Fifth Amendment, is that it? Is it game over at that point? No, apparently that's not. . . It does not seem that that's what the case. . . If the state did present evidence that is strong enough to rebut those allegations, then the court would not necessarily have to take a negative inference. Our argument is that, in this case, the state never presented any ample evidence. And Judge Walsh, she distinguished the facts of this case from the facts of Pupil v. World and indicated in her finding that, unlike World, in this case, there was no ample evidence to show that Mr. Gibson was tortured and that the state had provided ample evidence to rebut that. But that's not the case. Our argument is that the detectives took the Fifth Amendment. Detective Cedar was called. He testified that he never encountered Mr. Gibson at Area 3, so he really had nothing to offer. Detective Amy Lahau was called. He indicated he had no independent recollection of encountering Mr. Gibson, and only upon reading the reports could he testify that it appears from the reports that he interviewed a few witnesses. Then we have Detective Rusnick. He indicated that he also had no independent recollection, and if the abuse was not documented in any police report, he would have no way of testifying. Well, obviously, when will abuse be documented in detective supplements? So he absolutely had nothing to offer. And then we have Detective Moser. Detective Moser, his testimony, I think, should be, we should apply scrutiny to his testimony. This is the same detective who, at the trial, through him, Mr. Gibson's statement, came in through Detective Moser at the trial level, which was used to convict Mr. Gibson. So he finds himself in a peculiar position to, at trial, indicate that the statement was given freely and voluntarily, and then later, decades later, to say that, oh, there were allegations of abuse. I would say that what he said he never saw, he never laid eyes on the defendant until the 30th, right? He says, I don't know what happened before that. I don't know what happened on the 29th, which is where most of the alleged beating took place, right? He said, I didn't see him on the 29th. I didn't get him until the 30th. Short conversation, took his statement, and we were done, right? Correct. Okay. Where was Ms. Lanca? I'm sorry. Where was Ms. Lanca? Ms. Lanca. I'm sorry. Ms. Lanca, along with Paladino, appeared to work together, and they had, they were. No, no, no. I'm sorry. Where was he at the hearing? Oh, I'm sorry. Apparently, Ms. Lanca was not called. Do you know why? Do you know why? Is he alive? He is not alive. He's deceased? He's deceased, from my recollection. All right. Your Honor, so the State presented absolutely no evidence, or no probative evidence, to rebut this. But what they did offer were two theories that were absolutely unsupported. One theory was, perhaps Mr. Gibson was engaged in a fight with someone else, and that's where the injuries originated. Or, perhaps he caused injuries to himself. The State offered absolutely not one shred of evidence to support either of those theories. What about the burn? Your Honor, Mr. Gibson also indicated that he was burned while at Area 3 on his tattoo. Mr. Gibson, that was part of his claim to the church, and that was his testimony at the judicial hearing. Is there any photographs of that burn? There are no photos of that burn, Your Honor. Is there any medical testimony regarding the burn? No, Your Honor. There's no medical testimony in regards to that burn. However... In other words, there's no contemporaneous evidence. There's contemporaneous evidence, whether it's true or not. Sure. There's at least evidence that he was beaten from what he said to his sister, what he said to his bond court attorney and Judge Bestone, everything. But there's none of that with regard to the burn, right? I'm sorry. But there's none of that with regard to the burn on the arm. That is correct, Your Honor. The first time we heard about the burn on the arm was the clemency petition? The clemency petition, yes. Okay. And so the Turk Commission even thought, I know we're not reviewing the Turk Commission, but they didn't believe the burn, right? Sure. And Judge Walsh didn't believe the burn? Sure. So what do we do with that? That's a credibility finding. Is that a credibility finding that is worthy of our deference or what would you say about that? And I'll address that. I'm not in a position to necessarily discredit Mr. Gibson's claim. However, there is absolutely evidence of abuse that occurred other than the burn. So I would argue that the burn that he claims is not necessarily beyond the realm of possibility, given the fact that there is strong evidence, probative evidence, that he was abused otherwise. And even if the court is not comfortable with that allegation of torture, it does nothing to the remaining allegations of torture. Even if that allegation is excised, we still have the other allegations of torture which stand on their own. They have their own probative evidence, as you pointed out, the photos, the medical records. And as such, still the issue remains the same that he was, in fact, tortured while in custody. Now, also we believe that the court erred in not allowing certain evidence during the hearing. The trial court erred in not taking judicial notice of the pattern and practice of abuse by John Burge and his underlings during this time period that Mr. Gibson was interrogated. In fact, before the hearing, the defense presented a motion asking the judge, requesting that the court take judicial notice of a pattern and practice of abuse. And the reason that that is important is because Mr. Gibson's claim in a vacuum don't carry the same effect as when we know that actually his claims are consistent with other abuse that was reported during this time period. And if there's an acknowledgment that there was abuse during this time period by Mr. Burge and his underlings in the same area against people similarly situated as Mr. Gibson, then in fact his claim of torture becomes that much more credible, given that perspective. But is that how you do it? I mean, do you do it by holding up a document and saying, take judicial notice, judge, that people under Burge beat suspects? I mean, in the pattern and practice cases that you cite, and that you had an amicus on this whole question of pattern and practice, they always brought in live, well, it wasn't always live testimony. It was often live testimony of victims where they would bring in officers and say, what about this guy? Did you beat him? And maybe they take the fifth, maybe they don't, but you question them more. I think in one case, in one instance even in this trial, correct me if I'm wrong, you had a transcript of Mazlanka taking the fifth on a question. That's correct. We see things like that. I'm not aware of any case, so you correct me if I'm wrong, where you were able to prove a pattern and practice by saying, see, here's the Egan report and here's the Goldston report, so I'm done. I mean, was it that the judge wouldn't hear pattern and practice evidence or was it that she didn't like how you were presenting it? Well, I believe a combination of both, actually. I think the judge did make a ruling, an evidentiary ruling, that they were not permissible per hearsay rules. And that brings me to the rules of evidence and as they relate to this. Let's forget about that for a second and stick with what I'm asking. Sure. In those other cases, it seems like people bring in live testimony. Isn't that the way you do it? I mean, even if it was admissible, it's just holding up a report enough. I mean, those reports talk about any number of detectives and any number of victims, any number of ways they tortured people. Don't you usually see it where they try to hone down on the specific detectives that are being alleged and show the similarities, that kind of thing? I mean, that's what I would have expected to see in this hearing. I didn't see it. And I believe Mr. Goldstone, if I'm not mistaken, was actually brought in and presented to the court to testify in regards to his report. And his testimony along with the report should have been considered by the court. Your Honor, so in total, in regards to Mr. Gibson's hearing, we believe that the burden was not properly shifted to the state and the state did not provide any evidence to refute this allegation of torture. Also, we believe that certain evidence should have been allowed so that Mr. Gibson and the court could fully flush out these allegations of torture. And we also believe that the court should have drawn a negative inference from Detective Palladino and Sergeant Byrne not taking effect and not testifying. With that, Your Honor, I see that my time has come to an end. So I will conclude on that note. Thank you. Thank you, Mr. Moore. Mr. Arlott? Thank you, Your Honor. I will now move to the court. Judge Ellis made a very important point on the pattern in practice, Your Honor. People v. Patterson is really the key case on pattern in practice. And you're absolutely right, Your Honor. You just cannot come in and have the court assume a pattern in practice for this particular case. People v. Patterson, for competent pattern in practice evidence, it must, and I'm quoting the court, prior allegations of brutality have been found admissible where they involve the same officer or officers as in the defendant's case, where they involve similar methods of abuse, and where they occurred at or near the time of the defendant's allegations. None of that pertained here. What about the transcript they put in? The transcript that they introduced, that the defense introduced, was of Mezlonka taking the Fifth with regard to Johnson, right? Right. Okay. And Johnson was interrogated basically next door to the defendant, wasn't he? That's right, Judge. That's right. Yeah. But as far, Mezlonka was not involved in this interrogation. And Johnson himself. Wait. What? I'm sorry. The interrogation of Mezlonka was not involved in Gibson's interrogation? The interrogation, the key people interrogation of Gibson were Moser, Your Honor, Ruznik, Leia, and Caesar. Johnson was a defendant. The people who are listed in the room are Palladino. Right, right. Mezlonka, I'm mispronouncing everything now. Mezlonka. Mezlonka. Yeah. O'Mara, Collins, and Patak, right? Right. But the actual. Leia was a guy who just took notes and says, I have no memory of this guy or this case. But they all testified. They're consistent that it absolutely, and also the state's attorney, Your Honor. And Moser didn't interrogate him either, right? Moser just took his statement. That's the only time Moser appears, and the defendant has never said that Moser heard him. Right. But the testimony of the officers who were in the room are very consistent as far as no. What officer who was in the room said I didn't hurt him? I believe Moser. Moser was not in the room. Okay, okay. Am I wrong? I thought he was. Moser took his statement on the 30th, and Moser said on the 30th I took his statement. But he said, I think it's a quote. I have no idea what happened on the 27th, 28th, and 29th. Okay. I'm not trying to beat on you. I'm just trying to narrow down what we're talking about. No pun intended. Yeah. No pun intended. You know, I think the bottom line is, tell us, where is the rebuttal evidence? Show me. Where is it? The rebuttal evidence, Judge, is in the medical record. It's in the medical evidence. What in the medical evidence rebutts that he was tortured? The medical evidence does show that his chest was swollen, does it not? But not when. Pardon? That examination was done in January after he had been out for a couple of days, bond hearing, and Dr. Kaufman was clear that he could not say that any injuries that were evident at all in those records could be attributed to any kind of abuse or any kind of torture. He makes an immediate call to OPS as soon as he gets out of custody. Is that not correct? That's true. That's true, Your Honor. And as soon as he goes to bond court and has access to an attorney, he tells the attorney what happened. The attorney tells the judge, and they immediately get an investigator there. Is that correct? Right, right. And you're saying that that is insufficient proof? Your Honor, I'm saying that what you really have to show here is that there was a statement, confession that was a product of torture and coercion. There is not competent evidence against by the petitioners, by himself and the witnesses he called, that met the burden of proof as to whether or not his confession was the result of coercion. And the medical records don't back it up either. Wait a minute. The defendant in this case, he testifies that he was tortured. Okay? That's evidence. Whether it's believable or not, it's evidence. Now, what evidence is there that he wasn't tortured? The medical records show that he had edema in the chest and he had abrasions. Now, you're telling me that there's nobody that could say that those abrasions came from the torture. That's right. Well, is there any evidence he came from something else? Was it the tooth fairy who hurt him? Well, Judge, I mean, unless there is evidence that links this, the supposed, and they're not serious physical injuries. There's nothing that Dr. Kaufman found to have been a product of or a type of physical condition which showed trauma or distress, and the January 1990 records do not back up of any kind of serious physical injury. Well, when you say serious, there was no broken bones, but there was edema and there was swelling that showed that there was a trauma. That's a trauma. Right, yes, but not a significant trauma and nothing that could be linked to any in-custody conduct by the- Counsel, he was interrogated on the 29th. Right. He was released. He complained immediately to his sister. We've already gone over that. Justice Berg went through all that, makes a telephonic interview with OPS. He's arrested the next day. He's in custody the next day. Right. He goes back in, gets questioned a little bit more, makes a statement. I think I have this back. The 30th, he gets released. He gets picked up again the next day and arrested, and then he's in police custody the rest of the time. January 3rd, he gets photographed. That's five days after he says he was beaten. Right. Five days later, he's still got swelling in his chest. He's still got abrasions. I mean, it is five days later, right? So whatever it looks like, I'm going to take a guess that it looks a little better now than it did three or four days earlier. Sure, sure. He swears under oath that he was beaten. He's got corroborative evidence of things he said at the time. And you're absolutely right. Dr. Kaufman doesn't know who beat him up. Dr. Kaufman doesn't know if he didn't take something and beat himself. But he was in police custody almost that entire time, right? I mean, who else? Well, I mean, but when he was X-rayed and when he was examined on the 3rd, they could not establish, the medical records and the testimony did not establish, a link between any kind of superficial injury he had and any kind of misconduct. Well, how could they? I mean, how could a photograph do that? No, but they don't stamp their name on it after they punch him. I mean, you know, you're right. It's not conclusive. If that's your point, I think we would all agree it's not conclusive. But is it not corroborative? Your Honor, it is not corroborative because there is no sufficient link between the medical examination and his claim of the kind of beating, if you will, that he sustained. And especially since now it's become the centerpiece of his argument is this tattoo burning, which truly describes the credibility. But, you know, there was medical testimony that these injuries were consistent with a beating. Isn't that causation evidence? Consistent with a beating. I believe that the evidence is that it was consistent with some trauma. Okay, consistent with a trauma.  A beating is a trauma. You have two police officers here who take the Fifth Amendment, and they supposedly were doing the beating, and they say, no, I'm going to take the Fifth Amendment. Is the court supposed to disregard that kind of thing? Well, it depends. Won't they say the Supreme Court can disregard it some of the times and not all of the times? Well, the court should consider the Fifth Amendment very important when there's no other testimony that supports the state's position on the actual taking of statements. That's what we're getting down to. What evidence do you have, rebuttal evidence? What evidence, if any, that could rebut this? I couldn't find any. Well, Your Honor, Judge Walsh heard all of the people, the relevant detectives. There were two that took the Fifth. She had the ability to look at the testimony. She went through the incredibly contradictory and inconsistent testimony of Johnson and Gibson. Mr. O'Rourke, let's talk about, we had two police officers, one was a sergeant, who claimed the Fifth Amendment. I think what Justice Gordon is asking you is a very simple question. What did the state present that somehow filled in the gaps of those two officers who took the Fifth Amendment that allowed her to say, I do not have to make an adverse inference of them asserting the Fifth Amendment? The testimony of the detectives and the state's attorney. Okay, so we've had testimony of the detectives, two of which say they never saw the defendant, on those three-day periods when he was allegedly beaten, correct? Who do you have that says, I was there when these two detectives who asserted the Fifth Amendment were there and they didn't do anything? Where is that testimony? Okay, all right. Do we have anything, anything that would fill in that blank? So, on what basis can the judge not take an adverse inference on their claim of the Fifth Amendment? Based on the testimony of those who were involved and active in the actual handling of the Fifth Amendment. That's what I'm asking you for, Mr. O'Rourke. What is that testimony? I go back to the actual, the testimony of the detectives who testified, Your Honor. And, again, the burden of proof being that of the petitioner on a Turk case, and the petitioner did not meet the burden in the view of Judge Walsh, who did an excellent opinion and dealt with all of these issues. Well, she said there was ample evidence rebutting, and I think all trying to get down to this was the ample evidence. Detective Moser testified, but he said, I wasn't there at that time. He went to fairly great lengths to distance himself, I thought. Leah said, I did a few field reports. I don't remember this guy at all. Rusnick had no memory of the case. He admitted, I've got to look at my notes, and my notes, shockingly, don't say we beat him up. Breska didn't even testify. He testified by affidavit, and he said the same thing as Rusnick. I don't remember anything. Caesar said I didn't get there until the 31st, and I was working on Johnson's case. So those are all the people who testified. Now, there are two people who could have spoken directly to it because we know they were in the room. That's John Palladino. Is it John Palladino? Detective Palladino and Sergeant Byrd. Two people who had material knowledge, particularly Palladino, who you don't have to take the defendant's word for it. The police reports say he was in the room pretty much the whole time. They both say, I take the fifth. What are we supposed to do with that? I know what Judge Walsh said, but show us anything in the record that shows that somebody who knew anything about this came in and said, no, that didn't happen, because I don't think we're seeing it. All right, fair enough, Judge. I'm just saying that Judge Walsh had the ability to observe the testimony of the petitioner who never claimed a coercion for many, many years, never said anything about a burn or a tattoo until 2013, inherently incredible, as incredible and as not credible as the co-defendant, Mr. Johnson, and the lack of any strong record. What's your position on Johnson? You didn't offer to play with Johnson after you agreed to a trial. Did you ever take a position on whether he was tortured? I don't believe the State did. The State or you, were you? No, I was not involved in that. Was it the special state's attorney involved? I don't believe, not on Johnson. No, we're not, Your Honor. Are you the same special state's attorney, or is the office the same office that wrote the Egan report? We're the successor, Judge. You're the successor, so it's the, I mean, obviously not Judge Egan anymore, but it's the same body? It's that same? It's the same office, yes. It's the same office that was first established by Judge Bebo. At what point did you go from investigating claims of abuse to defending officers accused of it? I didn't know that that was something you did. It was in, I believe, 2002, 2003, when there was a case in part involving Burge and people working under Burge, and there was a conflict that was identified with a space attorney divine having represented Burge, and then Judge Bebo set up the report, and then after that, the cases started flowing. Do you consider those officers your clients? No. Pellegrino, Burge? No, they're not our clients, Judge. We represent people's interests wherever they are. I mean, we've had many cases where we've found that there was misconduct involved, but not evidence that would lead us to believe the Fifth Amendment, for example, where we've decided to release prisoners. So, no, we don't take a side advocating the police and the space attorney. We represent the people and people's interests wherever it may lie in a particular case. Thank you. Thank you, Mr. Verma. Mr. Bradshaw. So Detective Mazzlanca is deceased? Yes. We tried to find every detective involved, and those that we weren't able to find were deceased. Is that in the record anywhere? I'm not sure that it is. I know that the one that testified by affidavit was the only one that was out of state that wasn't deceased, that we couldn't get jurisdiction over. Two things that I initially announced, and I know that I'm rebuttal, and I'll go fast as I can. Under people versus world, once the evidence shows that a defendant, that a suspect, was injured, physically injured while in the custody of the police, the burden then shifts to the state to show by clear and convincing evidence that he wasn't abused by the police, that the police didn't cause those injuries. If the injuries result, and if the man says the injuries that the state, unless the state can come up with or rebut that presumption by clear and convincing evidence, and the man says I confessed or I gave a statement in this case that was considered by Judge Neville to be the extremely important piece of evidence that led to his conviction, as a matter of fact without it he wouldn't have convicted, clearly the statement can't come in and the conviction cannot stand because any conviction tainted by physical abuse is unconstitutionally a defective conviction. As to one thing I wanted to point out about Justice, I'm sorry, about Dr. Kaufman's report. His opinion was, and I quoted, it's quoted on a common law record on page 42, and I quoted on page 32 of our initial brief, he opined within a reasonable degree of certainty in the field of forensic and anatomical pathology that his findings of abuse were consistent with Mr. Gibson's allegation of being punched in the chest bilaterally. So it's more than just that he had abuse, but it was consistent with the allegation of being punched by the police. So it's simply that there is an evidentiary, an expert opinion, that ties the physical damage to his allegations of police abuse, that being the unrebutted expert opinion, and the state could have had the opportunity if they wanted to to bring in their own forensic pathologist, they didn't, so it's unrebutted expert opinion before the court. Or before that was admitted. I want to count, I know we talked briefly, they talked about the immediate outcry of the call to OPS. You have to remember that call to OPS occurred when Mr. Gibson had been released, and within an hour of being released he's on the phone with OPS complaining about being beaten. He doesn't get re-arrested until the next day. So he had no motive to fabricate. He'd been released. He didn't know he was going to be re-arrested. He didn't know that they were going to get another statement out of Johnson, which is the basis of re-arresting him. So he made that outcry when he had absolutely no motive to fabricate. None. His sister, the army officer, was outraged that while she's serving this country that her brother is abused by the police, and makes him call. And he tells the police. Now he doesn't, now we have, and as even the Turk points out, and this is on page 35 of the appendix, the core of Mr. Gibson's claims have remained consistent over time. From that time forward, the core allegations of abuse have never changed. Because you bring up the tattoo. And why do they bring up their tattoo? What else do they have? Now, I don't believe that Mr. Gibson is consciously lying about the tattoo. This happened 30 years ago. Human memory is not a tape recorder. It's not a computer. You know, the studies on it, when somebody remembers something, it comes out of memory, you use it, you remember it, and then you put it back into long-term memory. And every time you do that, like a computer, and she's been doing it probably daily for 30 years, things of small parts of it get corrupted, or mistaken, or changed, in slight, small points, just like a couple of digits in a large computer program. Somehow, Mr. Gibson believes, without a doubt, that that burn was caused by the police, and he has a burn. It was shown to Judge Walsh. So if he's saying that it happened by the police, he believes it. It's not a conscious lie. When did the tattoo get burned off? We have no physical evidence. But I would say it was the state's burden, because he says it happened in police custody, the state's burden to show when it happened, and they did it. Pictures when you're caught, when you're done in the Cook County Jail, they take pictures of you, head to toe. Every state penitentiary he's ever been into, pictures, head to toe. Medical records from, according to Terp, two volumes of medical records that state's attorney, that's in the IDOC, nobody ever looked at them. Any one of those things may have told us when this tattoo first, when this burn first appeared, was the burden on the state to do it. They didn't even inquire. Well, the medical records did not show any discoloration to show a burn. No, I must say that, that's absolutely true. But my point was, I'm saying that at some point it got burned off, and Mr. Gibson believes that that's when it happened. He's not consciously lying. It's just how he remembers it. That's over after 30 years. He's not over-exaggerating. It's not consciously. What I'm saying is, he remembers it that way. Is every memory from 30 years ago 100% accurate like a movie camera? No. And that's just the nature of human memory. So that's my only point on it. And like I said, I think it was the state's burden to show us where it came from, and they did it. And they could have at least made an attempt at it. The parent practice, as you say, about physical coercion, and we didn't know more, and by the way, just one last thing, we made a motion, a memo, we filed a memo with the court and copied the counsel at the beginning of the hearing that this burden-shifting was to occur. So the state knew they potentially had this burden to meet, and they did it. It's not as if we came up later. The parent practice and our motion to take judicial notice, we did something more than just look at the Goldstone report and the Egan report. And by the way, Detectives Malasankos and Palladino are the ones that the Egan report recommends get indicted. So it's interesting that those are the two officers that are in the room. But the pattern and practice, we also recognize all the other cases that talked about there being a pattern and practice, the Bella Court findings. We talk about the city of Chicago, who has adopted an ordinance recognizing that torture took place and establishing a fund for reparations and future education of torture victims. But that speaks to the general idea that there's been a burden scandal, which I think everybody knows. But that doesn't mean that these officers abused this person. No, it doesn't. Absolutely not. But that's not the purpose of pattern and practice. The purpose of pattern and practice, and that's what we're saying, as Your Honor just said, everybody knows it. What is the purpose? Make your sentence. The purpose of pattern and practice is to put the claim in context. If there's a pattern and practice by officers who worked under John Burge during this eight or ten year period of torturing African-American suspects in custody to get statements, and it's during that period of time that my client, an African-American young man in the custody of people, Burge was present at the time of his testimony. He's actually in the area too. It happened during that time. He's present with guys that worked directly under him. This is his midnight crew, by the way. You know, you turn midnight crew, Paladino, Malsanka. This is Byrne, O'Mara, Moser, Cesar, Collins, and Buffett. That's the midnight crew there in this case. But in his thing, that's it. So it puts it into context. It's not a claim made with no context. And the answer is, more likely than not, it asks that somebody in custody during that period was tortured as a way to their claim. And that's all pattern and practice really does. And finally, and I don't want to – did your honors look at the death penalty memo? In this case, it's at Defense Exhibit 15, where the state acknowledged that their case against Gibson is extremely weak, and they have the two sisters, one cooperating in the drug addict lab, who was originally a suspect who is now in custody in another armed robbery, and yet they ask for the death penalty. If anybody had asked me why we don't have a death penalty in Illinois, Exhibit A. Thank you, Mr. Brodsky. Thank you very much. We'll take the matter under advisement and issue an order as soon as possible. Thank you.